INTERNATIONAL UNION OF ELECTRICAL, RADIO &
MACHINE WORKERS, AFL–CIO, LOCAL 790
*v.* ROBBINS & MYERS, INC., ET AL.

No. 75–1264.  Argued November 9, 1976—Decided December 20, 1976*

---

*Together with No. 75–1276, *Guy* v. *Robbins & Myers, Inc.*, also on certiorari to the same court.

*Winn Newman* argued the cause for petitioner in No. 75–1264. With him on the briefs were *Ruth Weyand, Michael H. Gottesman, Robert M. Weinberg, J. Albert Woll,* and *Laurence Gold. Barry L. Goldstein* argued the cause for petitioner in No. 75–1276. With him on the briefs were *Jack Greenberg, James M. Nabrit III, Eric Schnapper,* and *Albert J. Rosenthal.*

*Fletcher L. Hudson* argued the cause for respondent Robbins & Myers, Inc., in both cases *pro hac vice.* With him on the brief was *Charles A. Lawrence, Jr.*†

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners seek review of a decision of the Court of Appeals for the Sixth Circuit holding that a claim brought by petitioner Dortha Guy under Title VII of the Civil Rights Act of 1964 was barred by her failure to file a charge with the Equal Employment Opportunity Commission (EEOC) within the statutory limitations period. They present three contentions: The existence and utilization of grievance procedures postpone the date on which an allegedly discriminatory firing took place; the existence and utilization of grievance procedures toll the running of the limitations period which would otherwise begin on the date of the firing; and the 1972 amendments to Title VII, Equal Employment Opportunity Act of 1972, 86 Stat. 103 (Mar. 24, 1972), extending the limitations period from 90 to 180 days, apply to the charge in this case.

I

Respondent Robbins & Myers, Inc. (hereinafter respondent), terminated the employment of petitioner Guy on October 25, 1971, and assigned as its reason for doing so her failure to comply with procedures contained in the collective-bargaining agreement pertaining to leaves of absence. Two days later petitioner caused a grievance alleging an "unfair action" of the company in firing her to be filed on her

---

†*Solicitor General Bork, Assistant Attorney General Pottinger, Walter W. Barnett, Abner W. Sibal, Joseph T. Eddins, Beatrice Rosenberg,* and *Charles S. P. Hodge* filed a brief for the United States as *amicus curiae* urging reversal in both cases.

*Jay S. Siegel* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance in both cases.

behalf in accordance with the provisions of the collective-bargaining agreement then in force between petitioner Local 790 of the International Union of Electrical, Radio and Machine Workers (Local 790) and respondent. That agreement's dispute-resolution procedure, which is to be commenced within "five (5) working days of the commission of the act originating the grievance," consists of three grievance steps followed by one arbitration step. Guy's grievance was processed through the third step of the grievance procedure where it was denied on November 18, 1971, with the finding that her termination had been in accordance with the provisions of the collective-bargaining agreement.

On February 10, 1972, a date 84 days after the denial of her grievance at the third stage, but 108 days after the date of her discharge, Guy, who is black, filed a charge of racial discrimination with the EEOC directed against both respondent and Local 790. The EEOC in November 1973 issued its determination and "right to sue" letter, finding that there was "no reason to believe that race was a factor in the decision to discharge" Guy. Her suit in the United States District Court for the Western District of Tennessee under 42 U. S. C. § 2000e–5, was met by a motion to dismiss on the ground, *inter alia,* that it was barred because of her failure to file a charge with the EEOC within 90 days of her discharge, § 706 (d), 42 U. S. C. § 2000e–5 (d).[1] The District Court dismissed her action,[2] and the

---

[1] At the time of her discharge, and at the time the charge was filed with the EEOC, § 706 (d) stated, in pertinent part: "A charge under subsection (a) of this section shall be filed within ninety days after the alleged unlawful employment practice occurred. . . ." Section 706 (d) was renumbered as § 706 (e), 42 U. S. C. § 2000e–5 (e) (1970 ed., Supp. V), as a result of the 1972 amendments to the Act. Whenever § 706 (d) is cited in this opinion, it refers to the pre-1972 version of what is now § 706 (e).

[2] Guy also alleged a cause of action under 42 U. S. C. § 1981. By order dated May 30, 1974, the District Court dismissed this cause of action

Court of Appeals affirmed that judgment by a divided vote, 525 F. 2d 124 (1975). That court felt that it would be "utterly inconsistent" with our opinions in *Johnson* v. *Railway Express Agency,* 421 U. S. 454 (1975) and in *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36 (1974), to hold that the pursuit of a contractual grievance procedure operates to toll a Title VII remedy "which the employee has a right to resort to concurrently." 525 F. 2d, at 126. Then, noting the question of the applicability of the 1972 amendments to Title VII raised by the EEOC as *amicus curiae* (also noting without more that "[s]ince this issue was not raised in the District Court by any party to the case, we are not required to consider it"), the Court of Appeals stated:

> "Plaintiff Guy's claim was barred on January 24, 1972. She did not file her charge with EEOC until February 10, 1972. The amendments to Title VII, increasing the time within which to file her charge to 180 days, did not become effective until March 24, 1972. 42 U. S. C. § 2000e–5 (e) [1970 ed., Supp. V]. The subsequent increase of time to file the charge enacted by Congress could not revive plaintiff's claim which had been previously barred and extinguished." 525 F. 2d, at 128.

The dissenting judge disagreed on this point, believing that the case should be remanded for consideration of the effect of the 1972 amendments.

We granted certiorari, 425 U. S. 950, to resolve an apparent Circuit conflict on two of these issues: tolling during the pendency of a collective-bargaining-contract's grievance mechanism,[3] and the applicability of the 1972 amendments

---

because of a failure to meet the applicable Tennessee statute of limitations. No appeal was taken from this decision.

[3] The question of the tolling of Title VII's limitations period during the pendency of grievance proceedings was noted in our opinion in

to charges filed more than 90 days from the date of the alleged discriminatory act but less than 180 days before the time the amendments became effective.

## II

Before reaching either of those questions, however, petitioners Guy and Local 790 assert that the complaint with the EEOC was timely filed, not because of any tolling concept, but simply because the date "the alleged unlawful employment practice occurred" is the date of the conclusion of the collective-bargaining agreement's grievance-arbitration procedures. Until that time, we are told, the October 25 discharge of Guy (although itself an "occurrence" allowing immediate resort to the EEOC) was "tentative" and "nonfinal," and remained so until she terminated the grievance and arbitration process, at which time the "final" occurrence transpired.[4] As a consequence, according to petitioners, the unfavorable termination of the grievance procedures, making the discharge "final," constituted an "occurrence" enabling Guy to start the 90-day period running from that date.

While the parties could conceivably have agreed to a contract under which management's ultimate adoption of a supervisor's recommendation would be deemed the relevant statutory "occurrence," this was not such a contract. For all that appears Guy was fired as of October 25, 1971, and all parties so understood. She stopped work and ceased receiving pay and benefits as of that date. Unless the griev-

---

*McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U. S. 273, 277–278 (1976), but had not been decided in the lower courts, and was not presented for us to decide.

[4] This assertion, which is also adopted by the EEOC as *amicus curiae,* is premised on the proposition that "[u]se of the grievance resolution process is not an 'appeal' of a 'final' decision, but is a method of obtaining the judgment of higher management on whether the employee should be retained," Brief for United States as *Amicus Curiae* 21; Brief for Petitioner Local 790, pp. 17–18.

ance procedures resulted in her reinstatement, she would not be entitled to be paid for the period during which the grievance procedures were being implemented.[5]  The grievance lodged on October 27, 1971, protests the "unfair action of *Co.* for discharge" (emphasis added), while the complaint filed in the District Court alleges Guy's disagreement, after learning of her discharge, "with the *Company's* determination that she had 'voluntarily quit,'" (emphasis added). Throughout the proceedings both in the District Court and in the Court of Appeals, both sides appear to have assumed, as did the courts, that the date of discharge was October 25, 1971.  There being no indication that either party viewed the October 25 discharge as anything other than "final,"[6] there is certainly no reason for us to now torture this mutual understanding by accepting the bare assertions to the contrary raised by petitioners for the first time before this Court.[7]

---

[5] Tr. of Oral Arg. 14.  Nor is there any indication that, should the grievance mechanism *not* be utilized, any sort of "formalized" final determination by management was required before Guy's discharge would have been considered final.  As the EEOC acknowledges, "the employer's foremen usually can fire an individual employee such as Guy," Brief for United States as *Amicus Curiae* 19.

[6] Even while raising the contrary arguments in their briefs before this Court, petitioners place the October 25 discharge as the action of respondent.  See, *e. g.,* Brief for Petitioner Local 790, p. 4 ("The following day [October 25, 1971] the Company discharged her on the ground that she had not complied with procedures embodied in the collective bargaining agreement pertaining to return from leaves of absence"); Brief for Petitioner Guy 5 ("The Company discharged Guy on October 25 for having 'voluntarily quit'").

[7] At oral argument, we were told that while this assertion was not articulated as a separate argument before the Court of Appeals, pertinent language in *Moore* v. *Sunbeam Corp.,* 459 F. 2d 811 (CA7 1972), was cited to that court, Tr. of Oral Arg. 11–12.  This is hardly a precise way to get an issue before a Court of Appeals, and there is no indication that the Court of Appeals recognized any such implicit contention, assuming, *arguendo,* that petitioners thought they were raising it.

## III

We think that petitioners' arguments for tolling the statutory period for filing a claim with the EEOC during the pendency of grievance or arbitration procedures under the collective-bargaining contract are virtually foreclosed by our decisions in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), and in *Johnson* v. *Railway Express Agency*, 421 U. S. 454 (1975). In *Alexander* we held that an arbitrator's decision pursuant to provisions in a collective-bargaining contract was not binding on an individual seeking to pursue his Title VII remedies in court. We reasoned that the contractual rights under a collective-bargaining agreement and the statutory right provided by Congress under Title VII "have legally independent origins and are equally available to the aggrieved employee," 415 U. S., at 52,[8] and for that reason we concluded:

> "[I]n instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process." *Id.*, at 54.

One Term later, we reaffirmed the independence of Title VII remedies from other pre-existing remedies available to an aggrieved employee. In *Johnson* v. *Railway Express Agency,* we held that the timely filing of a charge with the EEOC pursuant to § 706 of Title VII did not toll the running of the statute of limitations applicable to an action, based on the same facts, brought under 42 U. S. C. § 1981. In reaffirming the independence of Title VII remedies from

---

[8] See also 415 U. S., at 48–49: "Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination." We felt that the legislative history was quite clear in this respect, see, *e. g.*, 110 Cong. Rec. 7205, 13650–13652 (1964); H. R. 9247, 92d Cong., 1st Sess. (1971); H. R. Rep. No. 92–238 (1971); S. Rep. No. 92–415, p. 24 (1971).

other remedies, we noted that such independence might occasionally be a two-edged sword,[9] but "in the face of congressional emphasis upon the existence and independence of the two remedies," we were disinclined "to infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted," 421 U. S., at 461.

Petitioners insist that notwithstanding these decisions, equitable tolling principles should be applied to this litigation, and that the application of such principles would toll the 90-day period pending completion of the grievance procedures. This is so, they say, because here the "policy of repose, designed to protect defendants," *Burnett* v. *New York Central R. Co.*, 380 U. S. 424, 428 (1965), is "outweighed [because] the interests of justice require vindication of the plaintiff's rights."

But this is quite a different situation from *Burnett, supra.*[10] There the plaintiff in a Federal Employers' Liability Act action *had* asserted his FELA claim in the state courts, which had concurrent jurisdiction with the federal courts, but he had

---

[9] "Conciliation and persuasion through the administrative process [*e. g.*, Title VII], to be sure, often constitute a desirable approach to settlement of disputes based on sensitive and emotional charges of invidious employment discrimination. We recognize, too, that the filing of a lawsuit might tend to deter efforts at conciliation, that lack of success in the legal action could weaken the Commission's efforts to induce voluntary compliance, and that a suit is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be. But these are the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies. The choice is a valuable one," 421 U. S., at 461.

[10] In no way is this a situation in which a party has "been prevented from asserting" his or her rights, *Burnett* v. *New York Central R. Co.*, 380 U. S., at 429. There is no assertion that Guy was "prevented" from filing a charge with the EEOC within 90 days of October 25, 1971; indeed, it is conceded and even urged that she could have filed it the following day, had she so wished.

the misfortune of filing his complaint in an Ohio State court where venue did not lie under Ohio law. This Court held that such a filing was sufficient to toll the statutory limitations period, even though the state-court action was dismissed for improper venue and a new complaint ultimately filed in the United States District Court. The Court said:

> "Petitioner here did not sleep on his rights but brought an action within the statutory period in a state court of competent jurisdiction. Service of process was made upon the respondent notifying him that petitioner was asserting his cause of action." *Id.*, at 429.

Here petitioner Guy in the grievance proceedings was not asserting the same statutory claim in a different forum, nor giving notice to respondent of that statutory claim, but was asserting an independent claim based on a *contract* right, *Alexander* v. *Gardner-Denver Co., supra,* at 53–54, 56–58. *Burnett* cannot aid this petitioner, see *Johnson* v. *Railway Express Agency, supra,* at 467, and n. 14.[11]

Petitioners advance as a corollary argument for tolling the premise that substantial policy considerations, based on the central role of arbitration in labor-management relations, see *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564 (1960); *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957), also dictate a finding that the Title VII limitations period is tolled in this situation. Similar arguments by the employer in *Alexander* v. *Gardner-Denver Co.,* urging the superiority and pre-eminence of the arbitration process were rejected by us in that case, and we find the reasoning of that case controlling in rejecting this claim made by petitioners.

---

[11] We concluded in *Johnson* that "[o]nly where there is complete identity of the causes of action will the protections suggested by petitioner necessarily exist and will the courts have an opportunity to assess the influence of the policy of repose inherent in a limitation period," 421 U. S., at 468 n. 14. See n. 14, *infra.*

Petitioners also advance a related argument that the danger of possible conflict between the concurrent pursuit of both collective-bargaining and Title VII remedies should result in tolling the limitations period for the latter while the former proceeds to conclusion. Similar arguments to these, albeit relating to 42 U. S. C. § 1981 and not to private labor agreements, were however, raised and rejected in *Johnson.* We think the language we used in that case is sufficient to dispose of this claim:

"[I]t is conceivable, and perhaps almost to be expected, that failure to toll will have the effect of pressing a civil rights complainant who values his § 1981 claim into court before the EEOC has completed its administrative proceeding. One answer to this, although perhaps not a highly satisfactory one, is that the plaintiff in his § 1981 suit may ask the court to stay proceedings until the administrative efforts at conciliation and voluntary compliance have been completed. But the fundamental answer to petitioner's argument lies in the fact—presumably a happy one for the civil rights claimant—that Congress clearly has retained § 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time-consuming procedures of Title VII." 421 U. S., at 465–466.

Petitioners contend at some length that tolling would impose almost no costs, as the delays occasioned by the grievance-arbitration process would be "slight," [12] noting that the maximum delay in invoking the three-stage grievance procedure (although not including the arbitration step) under the collective-bargaining agreement in force in this

[12] Petitioners contend that the vast majority of collective-bargaining agreements have stringent time restrictions on the resolution of disputes through the grievance stages, see, *e. g.,* Brief for Petitioner Local 790, pp. 38–39; see also Brief for United States as *Amicus Curiae* 23 n. 13.

case would be 35 days. But the principal answer to this contention is that Congress has already spoken with respect to what it considers acceptable delay when it established a 90-day limitations period, and gave no indication that it considered a "slight" delay followed by 90 days equally acceptable. In defining Title VII's jurisdictional prerequisites "with precision," *Alexander* v. *Gardner-Denver Co.,* 415 U. S., at 47, Congress did not leave to courts the decision as to which delays might or might not be "slight." [13]

Congress did provide in § 706 (b) one exception for this 90-day limitations period, when it provided that the limitations period should run for a maximum additional 120 days when there existed "a State or local law prohibiting the. unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof." Where Congress has spoken with respect to a claim much more closely related to the Title VII claim than is the contractual claim pursued under the grievance procedure, and then firmly limited the maximum possible extension of the limitations period applicable thereto, we think that all of petitioners' arguments taken together simply do not carry sufficient weight to overcome the negative implication from the language used by Congress, cf. *Johnson* v. *Railway Express Agency,* 421 U. S., at 461.[14]

---

[13] Even taken on its own ground, this argument is not unambiguously favorable to petitioners. If the collective-bargaining dispute-settlement procedures are as speedy as suggested, no real need for tolling has been shown. In the instant case, for example, at the conclusion of stage three of the grievance procedure, Guy still had 66 days in which to file a charge with the EEOC, and no reason has been advanced as to why this was not ample time.

[14] Adherence to the limitations period assures prompt notification to the employer of a charge of an alleged violation of Title VII, see § 706 (b). The grievance process assures no such comparable notice. In the instant

## IV

Guy filed her charge with the EEOC on February 10, 1972, 108 days after her October 25, 1971, discharge. On March 24, 1972, the Equal Employment Opportunity Act of 1972, 86 Stat. 103, extended to 180 days the time within which to file a claim with the EEOC, § 706 (e). Petitioners contend that this expanded limitations period should apply to Guy's charge, as the occurrence she was complaining of took place within 180 days of the enactment of the 1972 amendments. We agree.

Section 14 of the Equal Employment Opportunity Act of 1972, 86 Stat. 113, states:

> "The amendments made by this Act to section 706 of the Civil Rights Act of 1964 shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act and all charges filed thereafter."

Respondent asserts that § 14, which was added by amendment to the bill on the floor of the House by Senator Javits, 118 Cong. Rec. 4816 (1972), was designed for the sole purpose of having the new enforcement powers given to the EEOC apply to pending charges, see letter of Feb. 14, 1972,

---

case, the grievance alleged only an "unfair action." Even if racial discrimination is explicitly discussed, however, the grievance procedure properly involves only *contractual* questions, and would but fortuitously implicate the Title VII standards, *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 53–54, 56–58; see also *Johnson* v. *Railway Express Agency*, 421 U. S., at 467–468, n. 14. Petitioners' arguments respecting the policies behind private resolution of labor disputes through collective bargaining, moreover, apply equally to the arbitration stage as they do to the grievance stage, cf. *Emporium Capwell Co.* v. *Community Org.*, 420 U. S. 50, 66–67 (1975); *Alexander* v. *Gardner-Denver Co.*, *supra*, at 56, 59–60; *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970). Yet, at the arbitration stage the assurance of but a "slight" delay is lacking.

from David L. Norman, Assistant Attorney General, Civil Rights Division of the Department of Justice, to Senator Dominick, quoted in *EEOC* v. *Christiansburg Garment Co.*, 376 F. Supp. 1067, 1074 (WD Va. 1974). However, the explicit statutory language used applies to *all* amendments made by the Act to § 706, not simply to the new enforcement provisions. As Senator Javits did not limit his remarks on the floor so as to indicate that § 14's retroactivity was designed to apply only to the new enforcement provisions,[15] the legislative history does not make this one of those unusual cases in which a court may infer, contrary to the language actually used, that Congress intended to so limit the scope of § 14, cf. also S. Rep. No. 91–1137, p. 31 (1970).

Respondent also contends that the amendment is not applicable to the charge filed by Guy with the EEOC, since, being untimely when filed, her charge could not have been "pending with the Commission on the date of enactment of this Act." This reading of "pending"—confining it to charges still before the Commission *and* timely when filed—is not the only possible meaning of the word, is largely rebutted by the legislative history,[16] and renders the language of § 14 virtually meaningless insofar as the enlarged limitations period is concerned. Since Congress also applied the enlarged limitations period to charges, whether or not untimely on March 24, "filed thereafter," we should not presume Congress created this odd

[15] Indeed, the comment of Senator Javits implied precisely the opposite: "MR. JAVITS. Mr. President, this amendment would make whatever we do enact into law applicable to pending cases. The Department of Justice has requested it in a letter to the minority leader; that is my reason for offering it." 118 Cong. Rec. 4816 (1972).

[16] Section 14 was stated to be designed to cover "charges filed with the Commission prior to the effective date of the Act," Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., Legislative History of Equal Employment Act of 1972, p. 1851 (Comm. Print 1972); see also *id.*, at 1777.

hiatus in retroactivity suggested by respondent unless congressional intent to do so was conveyed by language more precise than "pending," cf. *Love* v. *Pullman Co.,* 404 U. S. 522 (1972). "Pending" is simply not a term of art that unambiguously carries with it a meaning precisely suited for this situation; equally logical, for example, would be an interpretation that read "pending" to mean "filed and not yet rejected," cf. Leg. Hist., *supra,* n. 16, at 1851. We hold that Congress intended the 180-day period to be applicable to charges such as that filed by Guy, where the charge was filed with the EEOC prior to March 24, 1972, and alleged a discriminatory occurrence within 180 days of the enactment of the Act.[17]

Respondent contends, finally, that Congress was without constitutional power to revive, by enactment, an action which, when filed, is already barred by the running of a limitations period. This contention rests on an unwarrantedly broad reading of our opinion in *William Danzer Co.* v. *Gulf & Ship Island R. Co.,* 268 U. S. 633 (1925). *Danzer* was given a narrow reading in the later case of *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304, 312 n. 8 (1945). The latter case states the applicable constitutional test in this language:

> "The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation. What it does forbid is taking of life, liberty or property without due process of law. . . . Assuming that statutes of limitation, like other types of legislation, could be so manipulated that their retroactive effects would offend the Constitution, certainly it cannot be said that lifting the bar of a

---

[17] Accordingly, we need not decide whether the enlarged limitations period also redounds to the benefit of persons who filed a charge more than 90, but less than 180, days from the date of the alleged "occurrence," where the 180 days had run prior to March 24, 1972.

statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an offense against the Fourteenth Amendment." *Id.,* at 315–316.

Applying that test to this litigation, we think that Congress might constitutionally provide for retroactive application of the extended limitations period which it enacted.

We thus resolve against petitioners their first two contentions, but resolve the third in their favor. The judgment of the Court of Appeals for the Sixth Circuit is therefore reversed, and the cases are remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS agree that the expanded 180-day limitations period enacted by 86 Stat. 103 applied to Guy's charge and would reverse the Court of Appeals on that ground without addressing the questions discussed in Parts II and III of the Court's opinion.