**Dr. Nimai K. GHOSH, Plaintiff,**

**v.**

**NEW YORK UNIVERSITY MEDICAL CENTER, Defendant.**

**No. 82 Civ. 1449 (CBM).**

United States District Court,
S.D. New York.

July 28, 1983.

Windels, Marx, Davies & Ives by Raymond T. Munsell, Jack R. Fisher, New York City, for plaintiff.

S. Andrew Schaffer by Terrance J. Nolan, New York City, for defendant.

## OPINION

MOTLEY, Chief Judge.

This is an action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 *et seq.*, and 42 U.S.C. § 1981. Plaintiff, Dr. Nimai K. Ghosh (Dr. Ghosh), a native of India, alleges that defendant NYU Medical Center (NYU) discriminated against him with respect to his employment at NYU on the grounds of race, color, religion and national origin. Dr. Ghosh alleges that NYU discriminatorily (1) failed to employ him; (2) terminated his employment; (3) failed to promote him from "noncompensatory" to "compensatory" status; and (4) failed to pay him a salary during certain periods (*see* Complaint at ¶¶ 9 and 10).

The case is now before the court on NYU's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(b). NYU asserts that Dr. Ghosh's "charge" of discrimination was not timely filed with the Equal Employment Opportunity Commission (EEOC), and that Dr. Ghosh's cause of action under 42 U.S.C. section 1981 is barred by the applicable statute of limitations. For the reasons set forth below, NYU's motion is granted in part and denied in part.

## BACKGROUND

Dr. Ghosh's employment with NYU began on or about June 15, 1970.[1] He asserts that he was employed "as a full-time member of the faculty."[2] According to NYU, Dr. Ghosh was employed as a "research associate of Rody P. Cox, M.D. [(Dr. Cox)], a faculty member of the University's School of Medicine."[3] Dr. Ghosh claims that he "worked on various matters" in his employment with NYU, and worked on research projects with Dr. Cox and with a Dr. Joe Dancis "in the later years."[4]

NYU asserts that Dr. Ghosh's "relationship with the University and Dr. Cox initially *terminated* in September, 1978 ...."[5] Dr. Ghosh, on the other hand, asserts that he was "employed by N.Y.U. from September 1, 1978 to August 31, 1979, as a member of the faculty ..., as a part-time employee with the title of Research Associate Professor of Medicine."[6]

In support of this claim, Dr. Ghosh has submitted a copy of a letter dated February 26, 1979 and signed by L. Jay Oliva, Vice President for Academic Affairs. The letter reads in pertinent part:

It is with great pleasure that we confirm your appointment to the faculty of the New York University Medical Center for

---

1. Affidavit of Terrance J. Nolan in Support of Motion (Nolan affidavit) at ¶ 3A; Opposing Affidavit of Nimai K. Ghosh (Ghosh affidavit) at 1.

2. Ghosh affidavit at 1.

3. Nolan affidavit at ¶ 3A.

4. Ghosh affidavit at 1–2.

5. Nolan affidavit at ¶ 3B (emphasis added).

6. Ghosh affidavit at 2.

1978–79, as approved by the Medical Center Board of Trustees, with the title of

Research Associate

Professor of Medicine

Service: Part time

Effective: September 1, 1978

Exhibit 1 to Ghosh affidavit. Dr. Ghosh asserts that he performed research for NYU from September 1978 to December 1978 under the supervision of Dr. Cox. He states that he "did not receive compensation for this work since [Dr.] Cox informed [him] that the specific grants supporting [his] salary had not been renewed or funded." [7]

It is not disputed that Dr. Ghosh again began to receive remuneration for work on a part-time basis under Dr. Cox beginning in December of 1978.[8] According to Dr. Ghosh, Dr. Cox stated that this research would be funded by "a new grant funded by the National Institute of Health, *together with other grants which NYU already had*." [9] At that time, Dr. Cox was "considering accepting a position with Case Western University in Cleveland, Ohio [ (Case Western) ]." Dr. Cox planned to move the National Institute of Health (NIH) grant funds to Case Western if he accepted the position.[10] A letter dated December 6, 1979 and addressed to Dr. Ghosh is appended to NYU's motion papers. It states in pertinent part:

I am considering an offer from [Case] Western Reserve School of Medicine and may leave NYU in July, 1979, in which case your employment *under this grant* will terminate....

[s/] Rody P. Cox, M.D.

Professor of Medicine and Pharmacology

Director, Division of Human Genetics Exhibit J to Cox affidavit (emphasis added).

Dr. Cox accepted the offer from Case Western and, he asserts, "so informed Dr. Ghosh in January or at the latest during the first week of February, 1979." [11] Dr. Ghosh alleges that, "[c]ontrary to what Dr. Cox has stated in his affidavit ..., he did not tell me my employment would be terminated when he left." [12] The NIH grant funds were subsequently transferred to Case Western. (*See* Cox affidavit at ¶ 8, and Exhibits K, L, and M to Cox affidavit.)

Dr. Ghosh asserts that, on or about June 15, 1979, [Dr.] Cox told me that he had had a discussion with Dr. Saul Farber, Professor and Chairman of the Department of Medicine and Acting Provost and Dean of the School of Medicine, and that [Dr.] Farber had informed him that although [Dr.] Cox was transferring his work to Case Western Reserve University, [Dr.] Farber would make arrangements to continue my employment on other matters after [Dr.] Cox .... Also, he told me that although my salary from his grant would no longer be available, Dr. Farber had assured him that he would find some other way to pay me.[13]

Dr. Ghosh alleges that, in reliance on this representation, he continued working at NYU from June 30, 1979 to January 24, 1980. He states that "Dr. Farber was aware that I was not being compensated for the hours I was working and I was termed *temporarily*" [14]

Dr. Ghosh asserts that he spoke with Dr. Farber in July of 1979 "about my status as a 'non-compensatory employee.'" According to Dr. Ghosh, "Dr. Farber told me that N.Y.U. would resume paying my salary if I

---

7. *Id.*

8. Nolan affidavit at ¶ 3C; Ghosh affidavit at 3.

9. Ghosh affidavit at 3 (emphasis added). The Nolan affidavit simply states that "further grant funds became available" in December of 1978. *Id.* at ¶ 3C.

10. Affidavit of Rody P. Cox, M.D. (Cox affidavit) at ¶¶ 6, 7.

11. *Id.* at ¶ 8.

12. Ghosh affidavit at 3–4.

13. Ghosh affidavit at 3.

14. Ghosh affidavit at 4 (emphasis added).

could secure a position with a doctor in another department of the Medical Center." [15] He states that he then made attempts to secure a "transfer to a department that was funded by other grants." [16] Dr. Ghosh recounts the following sequence of events:

(1) In "May or June of 1979" Dr. Charles Hollander, Director of the Division of Endocrinology, offered him a funded position, but Hollander "later withdrew his offer, for reasons unknown to me."

(2) He was offered "a lower-paying position as a technician" by Dr. Al Szhuler, Acting Chairman of the Department of Pharmacology and Dr. Defendi, Chairman of the Pathology Department, in May or June of 1979. Both doctors subsequently withdrew their offers.

(3) On or about November 12, 1979, Dr. Hollander informed him that "[Dr. Hollander] would be able to place [Dr. Ghosh] as a technician," although a more suitable position was not available. The technician position "never became available."

(4) Dr. Ghosh was told in November of 1979 by the "Director of Administration" that he was being "considered for the position of Director of Chemical Biochemistry." No offer was ever made.

Ghosh affidavit at 4–5.

Dr. Ghosh has, in addition, provided the court with a copy of a letter dated November 29, 1979 and signed by L. Jay Oliva, Vice President for Academic Affairs. The letter informs Dr. Ghosh that, pursuant to the approval of the Medical Center Board of Trustees, Dr. Ghosh was appointed to the faculty as "Research Associate Professor of Medicine" on a part-time basis, effective September 1, 1979. The letter is appended to the Ghosh affidavit as Exhibit 2.

Dr. Ghosh also asserts that, after June 30, 1979,

I had discussions with Dr. Vittorio Defendi, Chairman of the Pathology Department, Dr. Jack Potter, Associate Dean, Dr. Dancis, Chairman of Pediatrics, and Dr. Milton Salton, Chairman of Microbiology, regarding N.Y.U.'s failure to pay me for my many hours of research. I was told repeatedly by these doctors that I should continue working and they eventually would find me a compensatory position.

Ghosh affidavit at 5.

He states that, in "reliance upon those representations," he continued his research at NYU "without pay." Dr. Ghosh states that he "was never told by any official of N.Y.U. not to continue my research because my employment was terminated. *The problem was the grant supporting my salary under Cox had ceased, not my employment by N.Y.U.*" Ghosh affidavit at 6 (emphasis added).

Dr. Ghosh asserts that, on or about January 24, 1980, he was told by Dr. Potter, Associate Dean, and Dr. Scott, Associate Dean, that he would not be transferred to another position and would not be compensated for his work. He states that "[t]his was the first time anyone at N.Y.U. had definitely told me I was not going to be paid for the work I had been doing and that I would not receive another permanent assignment." *Id.*

According to Dr. Ghosh, "fifteen or sixteen" other employees of the Human Genetics Division "had been given new assignments when the primary grant supporting their work had ended." Dr. Ghosh concludes that "I was not given a new assignment because I was a member of a minority group." *Id.* He states that "[n]o other N.Y.U. staff employee was refused transfer due to NYU's claimed lack of funds, or was terminated from employment asserted [sic] as the result of Dr. Cox's departure on June 30, 1979." *Id.* at 9.

Dr. Ghosh asserts that, after June 30, 1979, three grants were funded at NYU

**15.** *Id.*

**16.** *Id.*

and were available to support his salary. He specifies the following grants:

(1) One from the Brand Foundation, which Dr. Ghosh asserts supported part of his salary until June 30, 1979;[17]

(2) One from the American Cancer Society, for which grant Dr. Ghosh asserts that he was "co-principal investigato[r]" with Dr. Cox; and

(3) Another grant from the NIH, on which grant Dr. Dancis was the "principal investigator," and which was funded from 1977 to 1980. According to Dr. Ghosh, "[a]pproximately 40%" of his research "from 1978 to 1980 was under this grant."[18]

*Id.* at 8–9.

## PROCEDURAL HISTORY

Dr. Ghosh filed a "charge" of employment discrimination against NYU with the federal Equal Employment Opportunity Commission (EEOC) on January 24, 1980. The EEOC referred the charge to the New York City Commission on Human Rights, which dismissed the complaint by order dated September 30, 1981. The EEOC issued a "right-to-sue" letter on January 5, 1982. Dr. Ghosh filed a complaint in this court on March 9, 1982.[19]

## DISCUSSION

I. *Timeliness of Title VII Claim*

■ Dr. Ghosh concedes that, since New York is a "deferral state," his charge of discrimination must have been filed with the EEOC within 240 days of the occurrence of the alleged discriminatory act. *See* plaintiff's Memorandum in Opposition at 3–4; defendant's Memorandum in Support at 6; 42 U.S.C. § 2000e–5(e) (1976); *Mohasco Corp. v. Silver,* 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 2491 n. 16, 65 L.Ed.2d 532 (1980). The parties agree that, since Dr. Ghosh's charge was filed on January 24, 1980, the alleged discriminatory employment practice must have occurred on May 29, 1979, at the earliest, if Dr. Ghosh's charge is to be considered timely filed.

Summary judgment is appropriate only on demonstration 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' The court's function is not to try disputed issues of fact, but only to ascertain whether such an issue is present, and any doubt on that score is to be resolved against the movant. Since it is he who bears the onus of establishing his entitlement to summary judgment, his opponent enjoys the benefit of all favorable inferences from the evidence proffered; moreover, facts asserted by the non-movant, if adequately buttressed by evidentiary material, are to be taken as true.

*Abraham v. Graphic Arts International Union,* 660 F.2d 811, 814 (D.C.Cir.1981) (footnotes omitted).

In *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court held that the filing period for an action under Title VII begins to run on the date that the alleged discriminatory act occurred. *Id.* at 258–59, 101 S.Ct. at 504–05. Ricks, a faculty member of Delaware State College, had been given a one-year "terminal" contract after the College's Board of Trustees voted to deny him tenure. *Id.* at 252–53, 101 S.Ct. at 501. The Court determined that the discriminatory act complained of was the

---

**17.** NYU contends that "[t]hroughout the entire time of [Dr. Ghosh's] employment, his salary was paid exclusively from monies made available [to NYU] through research grants from third parties, secured through the efforts of Dr. Cox." Nolan affidavit at ¶ 3A.

**18.** *See* n. 17, *supra.*

Dr. Ghosh also specifies another grant from NIH, on which he asserts that he and Dr. Cox were "co-principal investigators," and which, according to Dr. Ghosh, was funded "from December 1, 1978 to November 31, 1981." *See* Ghosh affidavit at 8. It is unclear whether this is the same grant that Dr. Cox transferred to Case Western in the spring of 1979.

**19.** Dr. Ghosh commenced this action pro se. The court subsequently ordered counsel appointed for plaintiff from this court's Pro Bono Panel of attorneys.

denial of tenure. *Id.* at 258, 101 S.Ct. at 504. Ricks attempted to argue, however, that the "unlawful employment practice" complained of was not only his rejection for tenure but also his ultimate discharge. The Court rejected this contention, holding that the complaint failed to "identif[y] the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination. of his employment." *Id.* at 257, 101 S.Ct. at 503. "Mere continuity of employment," said the Court, "is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* The Court therefore held that Ricks' EEOC charge had not been timely filed.

> In sum, the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later.

*Id.* at 258, 101 S.Ct. at 504 (footnote omitted) (emphasis in original). "Where, as here, the only challenged employment practice occurs before the termination date, the limitations periods necessarily commence to run before that date." *Id.* at 259, 101 S.Ct. at 505 (footnote omitted).

Similarly, in *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam), the Court held that an action for employment discrimination pursuant to 42 U.S.C. § 1983 was barred by the applicable statute of limitations. The action had been filed more than one year after the plaintiffs had been notified that their employment would terminate on a specified date. *Id.* at 7–8, 102 S.Ct. at 28–29. "[R]espondents were notified, when they received their letters, that a final decision had been made to terminate their appointments. The fact that they were afforded reasonable notice cannot extend the period within which suit must be filed." *Id.* at 8, 102 S.Ct. at 29.

NYU contends that Dr. Ghosh's EEOC charge was not timely filed, arguing that Dr. Ghosh was "notified, at the latest, during the first week of February, 1979, that his salaried employment was to be terminated and it was then that the limitations period began to run, making a charge filed with the EEOC on January 24, 1980 untimely." Defendant's Memorandum in Support at 8.

In determining the issue of timeliness, this court's first task is to "identify precisely the 'unlawful employment practice' of which [Dr. Ghosh] complains." *Ricks*, 449 U.S. at 257, 101 S.Ct. at 503. NYU apparently construes Dr. Ghosh's complaint as alleging simply an unlawful failure to pay him a salary. NYU further appears to contend that Dr. Ghosh only expected to be paid from the NIH grant that was administered by Dr. Cox. NYU therefore concludes that, since Dr. Cox told Dr. Ghosh in February of 1979 that he would not be paid from that NIH grant after June 30, 1979, the limitations period for Dr. Ghosh's entire claim began to run in February 1979.

Dr. Ghosh does not seem to dispute NYU's contention that he was informed that funds from Dr. Cox's NIH grant would cease to be available for his salary as of June 30, 1979. Dr. Ghosh has, however, alleged that other grant funds were available to support his salary after June 30, 1979; that part of his salary during the December 1978 to June 30, 1979 period was supported by a grant from the Brand Foundation; and that he was given assurances well after the crucial May 29, 1979 date that he would be paid for his work and/or transferred to another Division of the Medical School. *See* Ghosh affidavit at 4–5. Moreover, Dr. Ghosh has submitted a copy of a letter stating that the Board of Trustees approved his appointment to a part-time faculty position for the academic year 1979–1980. *See* Exhibit 2 to Ghosh affidavit.

Dr. Ghosh's complaint indicates that he alleges, in addition to discriminatory non-payment of salary, unlawful termination of his employment and unlawful failure to promote him "from non-compensatory to compensatory status during 1979 through

1981." Complaint at ¶ 9. Furthermore, Dr. Ghosh has submitted an affidavit in opposition to the instant motion alleging conversations with specific NYU officials after June 30, 1979, and has identified specific grants which he contends were available to support his salary. Dr. Ghosh has clearly "[brought] to the ... court's attention some affirmative indication that his version of the relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

The court therefore holds that the unlawful employment practices of which Dr. Ghosh complains are not limited to NYU's allegedly discriminatory failure to pay him from the NIH grant administered by Dr. Cox. Although "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination," Dr. Ghosh has "identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." *See Ricks*, 449 U.S. at 257, 101 S.Ct. at 503.

Since, however, Dr. Ghosh does not dispute NYU's allegation that Dr. Cox informed him prior to May 29, 1979 that he would not be paid from Dr. Cox's NIH grant after June 30, 1979,[20] NYU's motion for summary judgment must be granted insofar as Dr. Ghosh complains that NYU failed to pay his salary from this NIH grant. Although Dr. Ghosh "enjoys the benefit of all favorable inferences from the evidence proffered" by NYU,[21] the only inference to be drawn from the evidence before the court is that Dr. Ghosh was aware prior to May 29, 1979 that he would no longer be paid from this grant. The limitations period thus began to run on this claim prior to May 29, 1979, and Dr. Ghosh's filing with the EEOC was thus untimely as to this element of his complaint.

NYU's motion must also be granted insofar as Dr. Ghosh's complaint is directed to NYU's failure to appoint him to a full-time faculty position for the academic year 1978–1979.[22] The evidence that Dr. Ghosh has submitted in opposition to the instant motion establishes that he was aware by late February of 1979 that his faculty appointment for the academic year 1978–1979 was for part-time status. (*See* letter dated February 26, 1979, appended to Ghosh affidavit as Exhibit 1.) Dr. Ghosh's EEOC charge with respect to this claim was therefore untimely filed.

The motion for summary judgment must also be granted as to Dr. Ghosh's claim that NYU discriminatorily failed to pay his salary prior to December of 1978, and as to Dr. Ghosh's claim that he should have been paid a full-time, as opposed to part-time, salary between December 1978 and June 30, 1979.[23] Dr. Ghosh states in his affidavit that

> [f]rom September, 1978 to December, 1978, I continued to perform research work on behalf of N.Y.U. under the supervision of Dr. Cox. I did not receive compensation for this work *since Cox informed me that the specific grants supporting my salary had not been renewed or funded.*

lenges NYU's "changing my full-time compensatory status of nine years ... against my wishes, to part-time non-compensatory status (beginning September 1, 1978 ...)." Complaint at ¶ 9D.

---

**20.** *See* Ghosh affidavit at 3. Indeed, Dr. Ghosh states that "[t]he problem was the grant supporting my salary under Cox had ceased, not my employment by N.Y.U." *Id.* at 6.

**21.** *Abraham v. Graphic Arts International Union,* 660 F.2d 811, 814 (D.C.Cir.1981).

**22.** In his affidavit, Dr. Ghosh states that "[i]n view of (1) the above-mentioned grants awarded to N.Y.U. from 1977 to 1981 and, (2) being a co-investigator on several of the grants, I should have been retained in the status of a full-time employee." Ghosh affidavit at 9. In addition, Ghosh indicated in his complaint that he chal-

**23.** *See* Complaint at ¶ 9D. Dr. Ghosh was not paid for his work between September of 1978 and December of that year. Dr. Ghosh was informed in December of 1978 that he "would be paid only for 17½ hours of work per week" for his work with Dr. Cox that was conducted during the spring of 1978. Ghosh affidavit at 2, 3.

Ghosh affidavit at 2 (emphasis added). Dr. Ghosh further acknowledges that Dr. Cox informed him in December of 1978 that he would be paid only a partial salary for his work with Dr. Cox after that date. Ghosh affidavit at 3. Dr. Ghosh was thus aware that he had only a part-time faculty appointment no later than February of 1979, and that he would not be paid a full salary for his work with ·Dr. Cox no later than December of 1978. Dr. Ghosh's charge of discrimination with respect to these claims was thus untimely filed with the EEOC. Summary judgment in favor of NYU is therefore appropriate with respect to these claims.[24]

NYU's motion for summary judgment must, however, be denied as to the remainder of Dr. Ghosh's Title VII claims, which are directed to events occurring after May 29, 1979. Dr. Ghosh has alleged that, subsequent to that date, certain NYU deans and department chairmen instructed him to continue his work, and assured him that he would be paid for that work. In addition, Dr. Ghosh alleges that he was offered three specific positions, all of which offers

were withdrawn. He has also indicated that he was told that a position as a technician would be found for him, and that he was told that he was "being considered for the position of Director of Clinical Biochemistry," but neither position was ever offered to him. Moreover, he has submitted evidence indicating that he was formally appointed to a part-time faculty position for the academic year 1979–1980. See Ghosh affidavit at 2–6. According to Dr. Ghosh, he was not informed that he would not be paid for his work or transferred to another position within the Medical School until January of 1980.

Accepting Dr. Ghosh's allegations as true, and drawing all inferences from disputed facts in Dr. Ghosh's favor, it certainly cannot be said that the only act of discrimination of which Dr. Ghosh complains is NYU's failure to continue to pay his salary from Dr. Cox's NIH grant. Neither can it be said that Dr. Ghosh was aware in February of 1979 that he would never be paid for his work nor transferred to another position. Indeed, the December 6, 1978

**24.** The court must reject Dr. Ghosh's attempt to render his EEOC charge and complaint timely as to all of his claims by characterizing NYU's alleged actions with respect to Dr. Ghosh's employment as "continuing violations." Dr. Ghosh's claim, in its entirety, is clearly one of discriminatory *treatment;* he has alleged no facts to indicate that NYU maintains a discriminatory employment *policy* with respect to members of minority groups. Indeed, Dr. Ghosh admits that no other similarly-situated minority group members were subjected·to the sort of treatment that Dr. Ghosh alleges he suffered:

As to the fifteen to sixteen employees that were reassigned in the Division of Human Genetics, there were no Hispanics, no Indians, except myself, and two Black employees, one of whom was a dishwasher, and the other a lower-level technician. There were no minority employees on the professional staff. *No other N.Y.U. staff employee was refused transfer* due to N.Y.U.'s claimed lack of funds, *or was terminated from employment* asserted [sic] as the result of Dr. Cox's departure on June 30, 1979.
Ghosh affidavit at 9 (emphasis added).

The cases cited by Dr. Ghosh in support of his "continuing violation" theory are inapposite. For example, in *Guardians Association of New York City Police Dep't v. Civil Service Commission,* 633 F.2d 232 (2d Cir.1980), *cert. granted,*

454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), the court found that the use of "tainted test results" in hiring "represented the culmination of a continuously maintained illegal employment policy." *Id.* at 249. The court therefore applied the principle that "the limitation period determining the timeliness of a complaint filed *as to such a policy* is measured from the last occurrence of an instance of that *policy.*" *Id.* (citations omitted) (emphasis added). Similarly, in *Rich v. Martin Marietta Corp.,* 522 F.2d 333 (10th Cir.1975), plaintiffs challenged the defendant's "entire promotion system maintaining that it continually operated so as to hold them in lower echelons." *Id.* at 348.

In *Jenkins v. Home Ins. Co.,* 635 F.2d 310 (4th Cir.1980), the court found that a continuing violation existed where defendants consistently paid the female plaintiff a salary lower than that paid to her male counterparts throughout the period of her employment. *Id.* at 312.

Here, Dr. Ghosh alleges that he, unlike other minority group members, was denied pay and was denied various employment opportunities. It is clear from Dr. Ghosh's own papers and pleadings that he does not contend that NYU maintains a consistently discriminatory *policy.* Rather, he cites a number of instances in which he was allegedly discriminatorily treated. These allegations cannot be read to state a continuing violation claim.

letter from Dr. Cox to Dr. Ghosh indicates merely that, if Dr. Cox decided to go to Cleveland, Dr. Ghosh's "employment under this [NIH] grant [would] terminate." *See* Exhibit J to Cox affidavit. Dr. Cox asserts that he informed Dr. Ghosh in January or February of 1979 that he would be moving his research to Case Western, and that Dr. Ghosh's salary under Dr. Cox's NIH grant would cease as of June 30, 1979. In view of the evidence offered by Dr. Ghosh, and construing NYU's evidence in the light most favorable to Dr. Ghosh, this court cannot find that Dr. Ghosh "kn[ew] or ha[d] reason to know [by February of 1979] that his employment [would] be terminated" for all purposes. *See* Defendant's Reply Memorandum in Support of Motion at 3.

NYU seeks to characterize Dr. Ghosh's allegations of acts of discrimination in the period following May 29, 1979 as an ineffectual "attempt to 'stretch out' the limitations period by [Dr. Ghosh's] efforts in seeking another position or a reconsideration of the decision,"[25] citing *International Union of Electrical Radio and Machine Workers v. Robbins and Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976) (*Electrical Workers*).

In *Electrical Workers,* the respondent had terminated an employee on October 25, 1971. The employee's pay and benefits ceased on that same date, and she stopped working on that date. 429 U.S. at 231, 234, 97 S.Ct. at 444, 446. She instituted a grievance under the applicable collective bargaining agreement two days after the termination. *Id.* at 231–32, 97 S.Ct. at 444–45. The grievance was denied on November 18, 1971. *Id.* at 232, 97 S.Ct. at 445. On February 10, 1972, a date "84 days after the denial of her grievance ..., but 108 days after the date of her discharge,"[26] the employee filed a charge of racial discrimination with the EEOC. *Id.* at 232, 97 S.Ct.

at 445. The Union contended that the charge was timely filed, arguing that the limitations period did not begin to run until the conclusion of the grievance procedures. The Court rejected this argument:

> For all that appears [the employee] was fired as of October 25, 1971, *and all parties so understood.*
>
> \*     \*     \*     \*     \*     \*
>
> The grievance ... protests the 'unfair action of *Co.* for discharge' (emphasis added) .... Throughout the proceedings both in the District Court and in the Court of Appeals, both sides appear to have assumed ... that the date of discharge was October 25, 1971. *There being no indication that either party viewed the October 25 discharge as anything other than 'final,'* there is certainly no reason for us to now torture this mutual understanding....

429 U.S. at 234–35, 97 S.Ct. at 446 (emphasis added) (footnote omitted).

The facts of *Electrical Workers* are readily distinguishable from the case at bar. Here, there is no indication whatsoever that Dr. Ghosh viewed the notification by Dr. Cox that funds under the NIH grant would cease to be available to support Dr. Ghosh's salary as a "final" discharge. Unlike the employee in *Electrical Workers,* Dr. Ghosh continued to work after the date on which the NIH funds were transferred to Case Western. It is indeed highly questionable whether NYU viewed the notification as a "final" discharge, given the subsequent discussions Dr. Ghosh asserts that he had with NYU officials and Dr. Ghosh's appointment to the faculty for the academic year 1979–1980. Furthermore, the discussions that Dr. Ghosh alleges took place and the representations that he alleges were made therein are clearly not analogous to an attempt to contest a "discharge" through a grievance procedure.[27]

---

**25.** Defendant's Reply Memorandum in Support of Motion at 3.

**26.** The then-applicable Title VII limitations period was 90 days. 429 U.S. at 232 n. 1, 97 S.Ct. at 445 n. 1.

**27.** *Rudolph v. Wagner Electric Corp.,* 586 F.2d 90 (8th Cir.1978), *cert. denied,* 441 U.S. 924, 99 S.Ct. 2033, 60 L.Ed.2d 397 (1979), a case which also involved a discharge and subsequent grievance arbitration proceeding, is similarly distinguishable from the case at bar. *See also Sutton*

NYU's motion for summary judgment must therefore be denied as to the remainder of Dr. Ghosh's claims pursuant to Title VII.

## II. Timeliness of Suit Under 42 U.S.C. § 1981

 In this state, the statute of limitations applicable to claims under 42 U.S.C. section 1981 is N.Y.Civ.Prac.Law & Rules § 214(2), which declares a three-year limitations period for actions based upon a liability created or imposed by statute. *See, e.g., Keyse v. California Texas Oil Corp.,* 590 F.2d 45, 47 (2d Cir.1978); *DeMatteis v. Eastman Kodak Corp.,* 511 F.2d 306, 312 n. 8, *modified on reh'g,* 520 F.2d 409 (2d Cir.1975).

As with a claim under Title VII, the limitations period begins to run when the plaintiff has notice of the allegedly discriminatory action. *Pauk v. Board of Trustees of City University of New York,* 654 F.2d 856, 861 (2d Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982).[28] *See also Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir.1981); and *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981).

The complaint in this action was filed on March 9, 1982. Dr. Ghosh's claims pursuant to section 1981 must therefore have accrued on or after March 9, 1979 to be timely. For the reasons set forth above, NYU's motion for summary judgment will be granted as to Dr. Ghosh's claims pursuant to 42 U.S.C. § 1981 insofar as they address:

(1) NYU's allegedly discriminatory failure to pay Dr. Ghosh's salary from the NIH grant that was administered by Dr. Cox;

(2) NYU's allegedly discriminatory failure to appoint Dr. Ghosh to a full-time

faculty position for the academic year 1978–1979;

(3) NYU's allegedly discriminatory failure to pay Dr. Ghosh a salary prior to December of 1978; and

(4) NYU's allegedly discriminatory failure to pay Dr. Ghosh a full salary between December 1978 and June 30, 1979.

NYU's motion for summary judgment is denied as to the remainder of Dr. Ghosh's claims pursuant to 42 U.S.C. § 1981.

---

*v. Aluminum Co. of America,* 500 F.Supp. 824 (E.D.Tenn.1980); and *Crook v. Penn Central Transportation Co.,* 427 F.Supp. 956 (N.D.Ill. 1977).

**28.** In *Pauk,* this rule was applied to an action under 42 U.S.C. § 1983. The court stated in dicta, however, that the same rule would apply to actions under section 1981. *See* 654 F.2d at 860 n. 3.