Patrick Jesse VIGIL, Appellant (Defendant),

v.

Esther TAFOYA, Appellee (Plaintiff).

No. 5072.

Supreme Court of Wyoming.

Sept. 17, 1979.

Ronald G. Pretty, Cheyenne, for appellant.

Franklin D. Bayless, Trierweiler, Bayless, Barrett & McCartney, Cheyenne, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

McCLINTOCK, Justice.

Patrick Jesse Vigil appeals from judgment of the district court adjudging him to be the father of Anthony Patrick Vigil, a minor child born November 24, 1968, and directing him to make support payments. The child was born and the original complaint filed during a period in which the Uniform Illegitimacy Act (Chapter 5, Title 14, W.S.1957) was in effect. This proceeding was commenced on May 4, 1977, more than eight years after the birth of the child. On May 27, 1977, the Wyoming Uniform Parentage Act (Ch. 174, S.L. of Wyoming 1977; Ch. 7, Title 14, W.S.1977; now Article 1, Title 14, W.S.1977, (December 1978 Repl.)) became effective and by order of the district court entered September 26, 1977, the plaintiff was ordered to continue

the proceeding in compliance with the latter act. A new complaint was filed and nothing further was done with respect to the complaint filed May 4, 1977. Vigil asserted in his answer that the court was "without jurisdiction because the Statute of limitations has expired."

In support of his appeal, defendant raises only two points: that clear and convincing evidence was not presented to rebut the presumption that the complainant's former husband, Julian Tafoya, is the natural father; and that the Uniform Parentage Act should not have been applied retrospectively, basing this argument on the claim that the formerly applicable statute of limitations, § 14-91; W.S.1957 (the repeal of which was effected by adoption of the later law) bars the action. We hold that there was sufficient evidence presented to rebut the presumption of paternity and further that the Uniform Parentage Act was intended by the legislature, and properly so, to supersede the former act in all respects.

■ Esther Tafoya, plaintiff and mother of the child, separated from her former husband, Julian Tafoya, sometime in 1966. She met Vigil in 1967 and from that time on they periodically lived together and had sexual relations. Esther and Julian were divorced on May 13, 1968. Anthony was born November 24, 1968, within 300 days after the marriage had been terminated by the divorce. This period is fixed by § 14-2-102, W.S.1977, December 1978 Repl., whereby it is presumed that Julian would be the natural father. Mrs. Tafoya testified that she was positive that Vigil was the father. Although the court did not make a specific finding that Vigil was the father, it did find that the natural mother and presumptive father were separated during the conceptive period and without sexual access. But such access had existed between Esther and Vigil, and there was no evidence of sexual access by a third party. It further found that the testimony rebutted the presumption of parentage by Julian. Reading the whole of the judgment it must be concluded that the trial court found defendant to be the father of Anthony. We believe this finding is supported by the evidence.

Appellant Vigil and appellee Tafoya were living together at the time of conception of Anthony Patrick Vigil. They discussed her pregnancy, and Esther Tafoya thought Vigil was happy about her being pregnant. Anthony Patrick Vigil was born November 24, 1968, at DePaul Hospital. There was a mix-up at the time as to the name to be put on the birth certificate and Esther Tafoya understood that she could not put the name of Vigil on the birth certificate, even though she knew Vigil was the father, because she was not legally married. She told the hospital to leave the birth certificate under the name Tafoya. Two months later she went to the Bureau of Vital Statistics and had the birth certificate changed to Anthony Patrick Vigil. Esther Tafoya told Vigil that she was going to have the birth certificate changed.

Patrick Jesse Vigil testified that he and Mrs. Tafoya could have been friends earlier than 1967 and 1968. They became friends at a time when Mrs. Tafoya's husband was still alive. Vigil could not remember when he first became intimate with Mrs. Tafoya, but it could have been in 1967 and 1968. He indicated that he could not say he and Mrs. Tafoya were not intimate two hundred eighty days prior to November 24, 1968, Anthony's birth date. He testified that in 1968 he stayed overnight with Esther Tafoya and probably on weekends. He did not recall when he first became aware that Esther Tafoya was pregnant with Anthony, but did indicate that he continued to see Esther after Anthony was born.

From the very beginning Patrick Jesse Vigil and Anthony Patrick Vigil maintained a father-son relationship. Anthony Patrick Vigil called him "Daddy" when he first learned to talk and the child has always called him "Daddy". Anthony Patrick Vigil called him "Daddy" in front of many people, including Esther Tafoya; Esther Tafoya's other children, including Dominick Tafoya, did not call him "Father".

It had been common knowledge that Mr. Vigil was Anthony's father and Vigil had called Anthony "son" and introduced him to

others as his own. Vigil never told Anthony he was not his father. Mrs. Tafoya testified that Vigil disciplined Anthony when he was living in her home. By his own admission Vigil disciplined Anthony.

On the birth certificate Patrick Vigil is specified as the father. Mrs. Esther Tafoya testified that Vigil was aware that Anthony Patrick Vigil was going to be baptized, and that Vigil picked the godparents or sponsors for the child. The godparents were Vigil's friends. Vigil testified that he was aware that Anthony Patrick Vigil was to be baptized, but did not remember whether he was aware that his name was to be used as the father at the baptism which occurred January 29, 1969. Vigil was aware that Anthony Patrick Vigil had his last name.

Following the birth of Anthony, Vigil admitted that he continued to see Esther Tafoya and lived in her home on weekends. At one time, evidently in 1977, he stayed for a month with Mrs. Tafoya, by his own admission. Mr. Vigil was a cement finisher and had to move from place to place where the work was. Vigil worked out of town and was on the road most of the time. He was making $10.30 per hour.

It is conceded that illegitimacy or filiation proceedings are purely the creation of statute since at common law an illegitimate child was considered the child of no one; *Stringer v. Dudoich,* 92 N.M. 98, 583 P.2d 462, 463 (1978). By enactment of the Uniform Illegitimacy Act in 1929, this state for the first time gave right of support to such children. The original act set forth a two-year statute of limitations, unless certain exceptions were met. Chapter 45, § 32, S. L. of Wyoming 1929 (§ 14–91, W.S.1957) provided as follows:

"Proceedings to enforce the obligation of the father shall not be brought after the lapse of more than two years from the birth of the child, unless paternity has been judicially established, or has been acknowledged by the father in writing or by the furnishing of support."

The Wyoming legislature adopted the Uniform Parentage Act in 1977. This act has also been adopted by six other states: California, Colorado, Hawaii, Montana, North Dakota, and Washington. Uniform Laws Annotated, Master Ed. (West 1979). Four of these states have discussed the question of retroactive application of the act. The language of the statute that we rely on in the case at bar is similar to language found in each of these state's acts, except Washington. The supreme courts of North Dakota and Hawaii have held that in light of the fact that their legislatures intended that the act be applied retroactively and for public policy reasons that the act apply retroactively to children born before its adoption. *In Interest of W.M.V.,* N.D., 268 N.W.2d 781 (1978); *Roe v. Doe,* Haw., 581 P.2d 310 (1978).

The Washington Court of Appeals has held that the two-year statute of limitations period set forth in the Filiation Proceedings Act does not preclude the state from filing suit under the Uniform Parentage Act. *State v. Douty,* 20 Wash.App. 608, 581 P.2d 1074 (1978).

However, the Colorado Court of Appeals has recently held that the Uniform Parentage Act does not create a new cause of action and that the period of limitations is determined by the act that was in effect at the time of the child's birth. *D.Z.M. v. D.A.G.,* Colo.App., 592 P.2d 1 (1978), as modified on denial of rehearing December 14, 1978, certiorari granted March 19, 1979.

In determining whether the act should be applied retroactively, we must first look to the language of the act. "We recognize the well established rule that statutes are not to be applied retroactively unless so provided therein, and this is especially true when substantive rights of parties are involved." *Bemis v. Texaco, Inc.,* Wyo., 400 P.2d 529, 530, reh. den. 401 P.2d 708 (1965); see also, *Johnson v. Safeway, Inc.,* Wyo., 568 P.2d 908, 914 (1977).

The relevant section of the act provides: "An action to determine the existence of the father and child relationship as to a child who has no presumed father under W.S. 14–2–102 may not be brought later than three (3) years after the birth of the

child, *or later than three (3) years after the effective date of W.S. 14–2–101 through 14–2–120, whichever is later.*" (Emphasis added.) § 14–2–105, W.S.1977 (December 1978 Repl.)

After considering the language of the act, we find that the legislature intended that the act be applied to children born both before and after the effective date of the act. If the legislature had not intended this result, it would not have included the language "or later than three (3) years after the effective date of W.S. 14–2–101 through 14–2–120, whichever is later." To hold otherwise would be to give this language no effect.

Furthermore, the Uniform Parentage Act is remedial in nature, and remedial legislation should be liberally construed. *Roe v. Doe,* supra, 581 P.2d at 315. As we stated in *McConnell v. Murphy Bros.,* 45 Wyo. 289, 293, 18 P.2d 629, 630 (1933), "statutes of the character under consideration should be interpreted with reasonable liberality, that the benefits they were intended to secure may be accomplished."

Paternity suits serve an important function in our society. They "relieve the public of the burden of supporting an illegitimate child and * * * provide the mother with assistance in carrying out her obligation of support." *Kuser v. Orkis,* 169 Conn. 66, 71, 362 A.2d 943, 945–946 (1975). We find that a liberal construction of the act leads to the conclusion that the legislature intended that the act apply to all children whenever born. The legislature's objective was "to foster these just and humane objectives." *Roe v. Doe,* supra, 581 P.2d at 314.

Next we must consider whether retroactive application of the statute of limitation that extends the time in which a paternity suit may be brought is constitutional. The United States Supreme Court has stated that statutes of limitation

" * * * are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control." *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945).

In *International Union of Electrical Radio & Machine Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976), the United States Supreme Court approved the use of a retroactive statute that extended the time that an action could be filed under the Civil Rights Act of 1964. The new statute of limitations revived a discrimination suit that had been barred under the repealed section of the act. The Court held that Congress could constitutionally "provide for retroactive application of the extended limitations period which it enacted." 429 U.S. at 244, 97 S.Ct. at 450–51.

In order to determine whether a retroactive application of a statute of limitation is constitutional, the Court applied the Chase Securities test to the act. The constitutional test set out in that case, 325 U.S. at 315–316, 65 S.Ct. 1137, is quoted in *International Union of Electrical, Radio & Machine Workers,* supra, 429 U.S. at 243–244, 97 S.Ct. at 450:

" 'The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation. What it does forbid is taking of life, liberty or property without due process of law. * * * Assuming that statutes of limitations, like other types of legislation, could be so manipulated that their retroactive effects would offend the Constitution, certainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an

offense against the Fourteenth Amendment.'"

Although there was no legal obligation to support one's illegitimate child at common law, the moral obligation has always existed. The purpose of legislation creating a paternity action is to convert a moral obligation into a legal right. *Cessna v. Montgomery,* 63 Ill.2d 71, 344 N.E.2d 447, 456 (1976); *Roe v. Doe,* supra, 581 P.2d at 314. The duty of a natural father to support his child begins when the child is born. This duty does not cease to exist even though judicial enforcement is barred by an artificial statute of limitation. *Tidwell v. Booker,* 290 N.C. 98, 225 S.E.2d 816, 827 (1976). As the court stated in *In the Interest of W.M.V.,* supra, "[p]utative fathers have no vested right in not being made a party to a paternity action." 268 N.W.2d at 786.

█ Applying the test set forth in *Chase Securities Corp.* supra, and cited with approval in *International Union of Electrical, Radio & Machine Workers,* supra, we are of the opinion that retroactive application of the statute of limitations enacted by the legislature does not deprive the defendant of his constitutional rights. The Uniform Parentage Act was correctly applied to the case at bar.

Affirmed.