Barton ELLISON, Appellant
(Respondent),

v.

Connie WALTER, ex rel. Rachele
I. WALTER, Appellees
(Petitioners).

No. 91–275.

Supreme Court of Wyoming.

June 24, 1992.

Bart D. Ellison, pro se.

Frank D. Peasley and Kari Jo Gray of Gray & Associates, Douglas, for appellees.

Before URBIGKIT, C.J., THOMAS, MACY and GOLDEN, JJ., and BROWN, J., Retired.

GOLDEN, Justice.

Barton D. Ellison (Ellison) appeals from a district court's judgment and order which, among other things, adjudged him to be the biological father of Rachele I. Walter (Rachele), a minor child born July 15, 1976; awarded judgment against him in the amount of $9,150 for back support from the date of Rachele's birth; and ordered him to make future child support payments of $50 per month until Rachele reaches the age of majority or is otherwise emancipated. We will affirm.

## ISSUES

The primary issues raised for our consideration are:

(1) Whether the evidence was sufficient to support a finding of paternity.

(2) Whether the petition to establish paternity was barred by the statute of limitations found in Wyo.Stat. § 14-2-104(a)(ii) or by the equitable doctrine of laches.

(3) Whether child support payments may be retroactively awarded to the date of the child's birth.

## FACTS

Ellison met Connie Walter (Walter) at a bar in Miles City, Montana, in August of 1975. Ellison and Walter dated through October of 1975, during which time they engaged in sexual relations. Walter first believed that she was pregnant in October of 1975, and subsequently informed Ellison of her suspected state. Ellison, who happened to be married, corresponded with Walter at various times during her pregnancy. Through the correspondence, Ellison generally acknowledged that he was the father of the expected child and expressed a desire to divorce his wife to be with Walter. Ellison and Walter apparently had contact only once following the birth of the child.

Rachele I. Walter (Rachele) was born in North Dakota on July 15, 1976. Walter and her daughter, Rachele, received public assistance from the state of North Dakota from July 1976 through April of 1978. As a condition of receiving public assistance, Walter assigned all her rights to support of Rachele to the state of North Dakota. When Walter reapplied for public assistance in 1985, North Dakota initiated a paternity/support action against Ellison, a Wyoming resident, pursuant to its Revised Uniform Reciprocal Enforcement of Support Act. The paternity/support action was duly certified to the district court of Sweetwater County, Wyoming, in October of 1985.

The paternity/support action proceeded slowly following its certification to the Wyoming district court. The procedural history of the case from October of 1985 to February of 1990 is largely irrelevant and does not merit a full recital. Suffice it to state that Ellison was notified of the proceedings against him, that he denied paternity, and that he underwent a human leukocyte antigen (HLA) genetic test which es-

tablished the probability of his paternity of Rachele at 99.9174 percent.

In February of 1990, an informal hearing was held at which Ellison again denied paternity and at which he requested a court appointed attorney. The district court subsequently appointed Ellison an attorney, and the parties prepared for what appeared to be an inevitable jury trial on the issue of paternity. Before trial, however, the parties stipulated to resolve the paternity issue with an additional genetic test. The stipulation, which was approved by the district court, provided that Ellison would be deemed the natural father of Rachele if a deoxyribonucleic acid (DNA) genetic test failed to exclude him as a possible father *and* established a probability of paternity at 97 percent or greater. A DNA genetic test was then performed which failed to exclude Ellison as a possible father and which established a probability of paternity at 99.98 percent. Pursuant to the terms of the stipulation, the district court entered an order in May of 1991 adjudging Ellison to be the biological father of Rachele.

Following the district court's paternity order, trial was set for September 23, 1991, on the remaining issues of support, visitation, and custody. Ellison "fired" his attorney before trial and proceeded to represent himself. A trial was then held on the issue of support, as Ellison did not request custody of or visitation rights with Rachele. After the trial, the district court entered an order which, among other things, confirmed that Ellison was the biological father of Rachele; awarded judgment against Ellison in the amount of $9,150 for back support from the date of Rachele's birth; and ordered Ellison to make future child support payments of $50 per month until Rachele reaches the age of majority or is otherwise emancipated. This appeal followed.

## DISCUSSION

### 1. *Sufficiency of the Evidence*

Ellison first contends that the evidence was insufficient to support the district court's determination that he is the biological father of Rachele. Ellison asserts that, due to a vasectomy performed in the spring of 1975, he was sterile at the time of Rachele's conception. We find Ellison's contention to be without merit.

When faced with a sufficiency of the evidence question, this court assumes all evidence of the successful party is true, leaves out entirely consideration of the unsuccessful party's evidence in conflict therewith, and gives the evidence of the successful party every reasonable and favorable inference. *Burns Rathole, Inc. v. Inter–Mountain Agency, Inc.,* 829 P.2d 823, 825 (Wyo.1992). Applying this standard of review, we find no error in the district court's determination that Ellison is the biological father of Rachele. The evidence upon which the district court based its finding of paternity was both substantial and persuasive. It included:

1) HLA and DNA genetic tests which established the probability of Ellison's paternity at 99.9174 and 99.98 percent, respectively.

2) A stipulation entered into by Ellison whereby he agreed to be deemed the biological father of Rachele in the event that a DNA genetic test established a probability of paternity at 97 percent or greater.

3) Several letters written by Ellison to Walter before the birth of Rachele wherein Ellison acknowledged paternity.

4) Sworn testimony of Walter that she had sexual relations with Ellison and no one else at the time of conception.

### 2. *Statute of Limitations or Laches*

Ellison also contends that the trial court erred by failing to dismiss the paternity/support action as barred by the statute of limitations contained in Wyo.Stat. § 14–2–104(a)(ii) (Supp.1991). Specifically, Ellison asserts that "[t]his Court has made a big mistake as W.S. 14–2–104 states that action must be brought within a reasonable time after obtaining knowledge but no later than five (5) years after the birth of said child." We disagree.

Section 14–2–104(a)(ii) provides, and has provided at all times relevant to this paternity/support action, as follows:

> (a) A child, his natural mother or a man presumed to be his father * * * may bring action:
>
> > (ii) For the purpose of declaring the nonexistence of a father and child relationship presumed under W.S. 14–2–102(a)(i), (ii), or (iii) only if the action is brought within a reasonable time after obtaining knowledge of relevant facts, but in no event later than five (5) years after the child's birth.

Section 14–2–104(a)(ii) is not applicable to the facts of this case. It applies to bar only actions to establish the *nonexistence* of paternity where there is a *presumed* father under the provisions of § 14–2–102(a)(i), (ii), or (iii). Ellison is not a presumed father under § 14–2–102(a)(i), (ii), or (iii), nor was the paternity/support action initiated to establish the nonexistence of paternity. Rather, this case was brought by North Dakota on behalf of Rachele to establish paternity for the purpose of obtaining a support order. The facts of this case are governed by § 14–2–104(c), which gives a state standing to bring a paternity/support action on behalf of a child with no presumed father within the time frame set forth in § 14–2–105(a). Section 14–2–105(a) provides, and has provided at all times relevant to this paternity/support action, that such actions must be initiated within three years after the child reaches the age of majority.[1] The present proceedings, which were initiated when Rachele was nine years old, fall well within the time frame established by § 14–2–105(a).

Ellison contends alternatively that the district court erred by not employing the equitable doctrine of laches to bar the paternity/support action. Ellison asserts that the nine-year delay between Rachele's birth and the initiation of these proceedings prejudiced his defense of sterility. Specifi-

cally, Ellison claims that he could not obtain records to verify the date of his vasectomy because they were destroyed after five years according to hospital policy. We find no merit to Ellison's laches argument. Nothing in the record substantiates Ellison's assertion that hospital policy is to destroy vasectomy records after five years or that Ellison's records were in fact destroyed. Moreover, evidence of paternity contained in the record contradicts Ellison's sterility claim. Particularly noteworthy is Ellison's own handwritten letter in which it is stated "when you told me about the baby I felt bad. So bad I had an operation to make me impotent, called it visectomy [sic]."

### 3. *Retroactive Support*

Ellison's final contention is that the district court erred by awarding back support to the date of Rachele's birth. We find no error in the district court's order.

In *Vigil v. Tafoya*, 600 P.2d 721 (Wyo. 1979), this court was faced with determining whether the statute of limitations contained in the Uniform Parentage Act of 1977 (UPA) could be applied retroactively to children born before the effective date of the UPA. In the context of deciding the issue in the affirmative, this court commented upon the purpose of the UPA and on the duty of a father to support his minor child as follows:

> Although there was no legal obligation to support one's illegitimate child at common law, the moral obligation has always existed. The purpose of legislation creating a paternity action is to convert a moral obligation into a legal right. *Cessna v. Montgomery*, 63 Ill.2d 71, 344 N.E.2d 447, 456 (1976); *Roe v. Doe*, [59 Haw. 259] 581 P.2d [310, 314 (Haw.1978)]. The duty of a natural fa-

---

1. The version of Wyo.Stat. § 14–2–105 effective in 1985 was not broken into subsections. 1978 Wyo.Sess.Laws ch. 25, § 1. An amendment to § 14–2–105, effective June 8, 1989, rewrote the first and second sentences so as to combine them and designate them as subsection (a), and designated the former third sentence as subsection (b). 1989 Wyo.Sess.Laws ch. 168, § 1. Since the substance of § 14–2–105 as it relates to this appeal was not changed by the 1989 amendment, we cite to the statute in its amended form.

ther to support his child begins when the child is born.

*Id.* at 725.

■ Consistent with the view expressed in *Vigil,* we now hold that the duty of a natural father to support his child begins at birth. The establishment of paternity by judicial decree is merely a procedural prerequisite to enforcement of the duty of support owed to the child: it does not create, but only defines the preexisting duty. *See Tidwell v. Booker,* 290 N.C. 98, 225 S.E.2d 816, 827 (1976).

■ Having determined that a father's duty of support begins at his child's birth, we next examine whether the district court was statutorily authorized to award child support retroactive to the date of Rachele's birth. The *Vigil* opinion again provides this court with some guidance. The court there stated that the UPA, being remedial in nature, "should be interpreted with reasonable liberality, that the benefits * * * [it was] intended to secure may be accomplished." *Vigil,* 600 P.2d at 724 (quoting *McConnell v. Murphy Bros.,* 45 Wyo. 289, 293, 18 P.2d 629, 630, 88 A.L.R. 376 (1933)).

Applying a fair and reasonable interpretation to the UPA, we find that the legislature intended the retroactive collection of child support under the circumstances of this case. One of the foundational premises underlying the UPA is that a father of a minor child receiving public assistance ought to reimburse the public fisc for the support of his child. *See Vigil,* 600 P.2d at 724. To further this policy, the UPA grants standing to a state to initiate a paternity action on behalf of a child receiving public assistance within three years after the child reaches the age of majority. Wyo.Stat. § 14–2–105(a). The objective of the paternity/support action in this context is, of course, to ultimately obtain a support order payable on behalf of the minor child to the state. *See* Wyo.Stat. §§ 20–2–106 & 107 (Supp.1991). Since a father's duty of support is generally only coextensive with the child's minority, the logical inference to be drawn from the fact that § 14–2–105(a) allows paternity/support actions to be initiated after a child reaches the age of majori-ty is that the legislature contemplated the collection of back support.

The inference that the legislature anticipated the retroactive collection of child support is enforced by reference to § 14–2–113(c), which addresses the scope of a judgment in a paternity action:

> The judgment or order may contain any other provision directed against the appropriate party to the proceeding concerning the duty of support, the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond or other security for the payment of the judgment or any other matter in the best interest of the child. The judgment or order may direct the father to pay the reasonable expenses of the mother's pregnancy and confinement.

Wyo.Stat. § 14–2–113(c) (Supp.1991).

As is evident from § 14–2–113(c), the legislature anticipated that the trial court could, in a paternity action, reach back to expenses incurred during the "mother's pregnancy and confinement" and provide for such in its judgment and order. It logically follows that the district court should also have the authority to provide for expenses incurred to support the product of the pregnancy, the child, following the mother's "pregnancy and confinement." Subsection (d) of § 14–2–113 supports this interpretation by directly addressing the district court's role as it relates to back support. Section 14–2–113(d) provides in relevant part: "The court, as it deems just, may limit the father's liability for past support of the child to the proportion of the expenses already incurred."

■ From our review of relevant statutory provisions, we conclude that a district court possesses the authority to issue support orders retroactive to the date of a child's birth in paternity/support actions initiated by a state for the reimbursement of public assistance. The guiding principles in each instance are to promote the welfare of the child and to serve the ends of justice. We are persuaded that neither principle is generally served by failing to acknowledge a father's duty to support his

child from the date of birth. Consequently, retroactive child support orders should be the rule, rather than the exception. The burden is accordingly placed upon the father to demonstrate to the district court why a retroactive child support order should not issue in a particular case.[2]

■ In light of the foregoing, the only remaining issue is whether the district court abused its discretion under the circumstances of this case by awarding $50 per month child support retroactive to the date of Rachele's birth. The district court's back support award totaled $9,150. It was premised upon findings that Ellison is the father of Rachele, that he had not contributed to her support, that he had an average monthly income of $600, and that the state of North Dakota had contributed over $16,000 to Rachele's welfare since her birth. Based upon these facts, we hold the district court did not abuse its discretion.

### DISPOSITION

The judgment and order of the district court is affirmed in all respects.

---

**2.** For a sampling of recent cases which recognize a father's duty to pay child support retroactive to the date of his child's birth, see, e.g., *State ex rel. Coleman v. Clay*, 805 S.W.2d 752 (Tenn.1991); *J.A.W. v. D.M.E.*, 591 A.2d 844 (D.C.App.1991) & *W.M. v. D.S.C.*, 591 A.2d 837 (D.C.App.1991) (retroactive child support should be the rule rather than the exception); *Mason v. Reiter*, 564 So.2d 142 (Fla.Dist.Ct.App.1990); *Weaver v. Chester*, 195 Ga.App. 471, 393 S.E.2d 715 (1990); *State v. Johnican*, 830 S.W.2d 215 (Tex.Ct.App.); *Goheen v. Koester*, 794 S.W.2d 830 (Tex.Ct.App.1990) (writ of error denied).