**Joselito VITUG, Plaintiff,**

v.

**MULTISTATE TAX COMMISSION; Dan R. Bucks, as Executive Director; Les Koenig, as Director of Audit; and Member Commissioners, in their capacity as Commissioners, Defendants.**

No. 93 C 5357.

United States District Court, N.D. Illinois, Eastern Division.

July 27, 1994.

---

Robert M. Motta (argued), Oak Park, IL, for plaintiff.

Judith Yvette Gaston (argued), Katten, Muchin & Zavis, Chicago, IL, Charles W. Newcom, Sherman & Howard, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Joselito Vitug brings this two count complaint, alleging discrimination in employment practices by defendants Multistate Tax Commission, Executive Director Dan Bucks, Director of Audit Les Koenig, and member commissioners. Presently before the court is defendants' motion for summary judgment. For the reasons set forth below, defendants' motion is granted.

### I. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

### II. Background

Joselito Vitug is a male Filipino who was employed as an auditor at defendant Multistate Tax Commission (MTC) from April, 1985 until January 1, 1993. In June, 1991, Vitug was one of six applicants interviewing for the position of Field Audit Supervisor with MTC. The interviews were conducted by three MTC employees: Les Koenig, a white male who was Vitug's manager at the time, Alice Davis, an African–American female, and Anita Williams, a white female. Each interviewee was asked the same ten questions; the responses were separately evaluated by each interviewer and given a score. Each interviewer independently tallied his or her scores; the panel then compared the scores that each interviewer had given the candidates. Of the candidates, Vitug was given the lowest score by each of the interviewers. Another applicant, Harold Jennings, who is white, was given the highest score by each of the interviewers, and was offered the position. Jennings and Koenig were both born-again Christians and attended the same church; indeed, Koenig had

informed Jennings about the opening at MTC at church.[1]

When Vitug was informed that he had not received the promotion, he submitted a written grievance to MTC. Scott Smith, one of MTC's employees from its Washington, D.C. office, conducted hearings, and recommended in a written memorandum dated August 16, 1991 that the grievance be denied. Further hearings were conducted by MTC Executive Director Dan Bucks in September, 1991. In a letter dated January 29, 1992, Bucks denied Vitug's grievance. On April 10, 1992, Vitug filed a charge with the Illinois Department of Human Rights (IDHR); that agency referred the charge to the Equal Employment Opportunity Commission (EEOC) on May 17, 1992, which subsequently issued a Right to Sue letter. On December 16, 1992, claiming that the denial of the promotion and deteriorating conditions at MTC had created a hostile work environment, Vitug tendered his resignation, effective January 1, 1993. He filed the instant lawsuit on September 1, 1993.

### III. Discussion

In his complaint, Vitug raises essentially two challenges to defendants' employment practices. First, he asserts that he was wrongfully denied a promotion in June of 1991. Second, he claims that defendants' various actions created an intolerable work environment, compelling him to terminate his employment on January 1, 1993. Accordingly, he asserts, he was constructively discharged. Vitug further alleges that defendants' wrongful actions constituted discrimination based upon his race, ethnic origin, and religion. Each of Vitug's claims will be considered in turn.

### A. Failure to Promote

Vitug's first claim, and indeed, the crux of Vitug's complaint, is that he was denied a promotion to Field Audit Supervisor because of his race, ethnic origin, and/or religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, and of 42 U.S.C. § 1981. Defendants contend that Vitug's promotion claim is time barred under both Title VII and § 1981. We agree.

■ We first consider Vitug's Title VII claim. It is well established that a condition precedent to the maintenance of a Title VII action in court is the timely filing of a discrimination charge with the EEOC. *See Perkins v. Silverstein,* 939 F.2d 463, 469–70 (7th Cir.1991). As a general rule, a complainant must file the EEOC charge within 180 days of the claimed discrimination. 42 U.S.C. § 2000e–5(e). In the present case, Vitug was informed that he did not receive the promotion on June 20, 1991. He filed a charge of discrimination with the IDHR[2] on April 10, 1992, some 293 days after he was denied the promotion. He nonetheless maintains that his filing was timely, and offers several arguments in support of this conclusion.

Vitug first suggests that his case falls within an exception to the 180 day requirement. This exception provides:

[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred....

42 U.S.C. § 2000e–5(e)(1). Vitug maintains that he is entitled to the three hundred day period because he initially filed his claim with the IDHR, which, Vitug maintains, possessed the authority to grant the relief he sought.

■ As a general rule, the Illinois Human Rights Act does not apply to employers

---

1. Later that week, the same panel used the same ten questions and procedure to fill an opening in MTC's New York office. Of the four applicants, a white female received the highest numerical score, but declined the position. The individual receiving the second highest score was an Asian male, George Fung, who accepted the position.

2. The IDHR and the EEOC have executed a "worksharing" agreement, whereby any action filed with the IDHR is considered to have been simultaneously filed with the EEOC. Accordingly, in the present case, we shall treat Vitug's discrimination charge as if it were filed with the EEOC on April 10, 1992.

such as MTC, which have fewer than fifteen employees within the state of Illinois. 775 ILCS 5/2–101(B)(1)(a). Indeed, the IDHR concluded that it lacked jurisdiction over Vitug's discrimination charge because of the small size of MTC's Illinois office, and therefore transferred it directly to the EEOC. Vitug now contends that the IDHR did in fact have the authority to consider his claim under subsection (d) of 775 ILCS 5/2–101(B)(1), which includes in the scope of employers covered under the act "[a]ny party to a public contract without regard to the number of employees." Noting that MTC has contracted with various states, including California, New Mexico, Nebraska, New Jersey, Maine, Alabama, and Arizona, and has been paid for these contracts with public funds, Vitug argues that MTC is a "party to a public contract," and thus falls under the scope of the Illinois Human Rights Act. Defendants respond that, although " 'public' is not defined in that subsection," it is apparent from the context in which it is used that "public contract" means a contract with Illinois, and it is undisputed that MTC has no contracts with Illinois or any of its agencies or political subdivisions.

While "public" may not be defined in the Act, "public contract" certainly is. In the section entitled "General definitions," the term "public contract" is defined as

> every contract to which the State, any of its political subdivisions or any municipal corporation is a party.

775 ILCS 5/1–103(M). Based upon this definition, it is apparent that Vitug's assertion is simply incorrect. Because MTC has no "public contracts" within the meaning of the Act, and because it has fewer than fifteen employees in Illinois, the IDHR lacked the authority to award Vitug any relief. Accordingly, Vitug cannot fit himself within the three hundred day period based upon this argument.

Vitug also suggests, somewhat cryptically, that the Seventh Circuit "has held that Title VII plaintiffs need not file with the IDHR within 180 days." In support, he points to *Gilardi v. Schroeder*, 833 F.2d 1226 (7th Cir. 1987). In *Gilardi*, however, the court expressly noted that Illinois residents "are not required to file with the EEOC until 300 days after the act of discrimination *so long as they meet the statutory prerequisite for the extended filing period.*" *Id.* at 1230, citing *Lorance v. AT & T Technologies, Inc.*, 827 F.2d 163, 165 n. 2 (7th Cir.1987), *aff'd*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). Vitug is now back where he started. That is, the "statutory prerequisite" for the extended filing period is that the complainant initially file his charge with a state agency "with authority to grant or seek relief from" an unlawful employment practice. 42 U.S.C. § 2000e–5(e). As discussed above, the IDHR lacked that authority in Vitug's case. As a result, Vitug failed to meet the statutory prerequisite for the 300 day filing period, and was therefore required to file within 180 days.

Vitug finally claims that, even if the 180 day period is appropriate, as we have concluded it is, his IDHR/EEOC filing falls within that time frame, since his bid for the promotion was not finally denied until January 29, 1992, when his internal grievance was denied. However, the Supreme Court has repeatedly stated that "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Delaware State College v. Ricks*, 449 U.S. 250, 261, 101 S.Ct. 498, 506, 66 L.Ed.2d 431 (1980), citing *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976).[3] Instead, the relevant

---

**3.** Vitug claims that *Ricks* is inapposite, because he "was led to believe that he would receive the promotion" as a result of the grievance hearings, a factor not present in *Ricks*. Vitug offers essentially two arguments in support of his "belief." First, he maintains that MTC lacked a formal grievance procedure, and the fact that a unique procedure was establish his grievance indicated that the initial decision would be reversed. However, *Ricks* specifically states that *no* grievance procedure or collateral review process tolls the running of the time limits. *See Ricks*, 449 U.S. at 261, 101 S.Ct. at 506. It is therefore irrelevant whether the procedure was already established or created specifically for Vitug, and Vitug's perception of the nature of the grievance procedure does not alter this result. Second, Vitug maintains that defendant Bucks, who considered Vitug's grievance, assured Vitug that the matter would be handled "conscientiously and

date is the date of the alleged discriminatory practice, that is, June 20, 1991, the date that Vitug was actually denied the promotion. *See Ricks,* 449 U.S. at 257, 101 S.Ct. at 503–04. Because his filing occurred more than 180 days after that date, Vitug's promotion-related Title VII claim is time-barred, and defendants are therefore entitled to summary judgment.[4]

 Indeed, the above ruling is dispositive of Vitug's promotion-based § 1981 claim as well. The statute of limitations applicable to § 1981 claims in Illinois is two years. *See Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1308 (7th Cir.1989). As noted above, the relevant starting date is June 20, 1991, the date on which Vitug was denied a promotion, and was thus subject to the alleged discrimination. *See Wilson v. Giesen,* 956 F.2d 738, 740 (7th Cir.1992) ("Civil rights claims, therefore, accrue when the plaintiff knows or should know that his or her constitutional rights have been violated."). However, Vitug did not file the present complaint until September 1, 1993. This clearly falls outside of the statute of limitations; Vitug's promotion-based § 1981 claim is therefore untimely.[5] Accordingly, defendants are entitled to summary judgment on that claim as well.

### B. Constructive Discharge

 Vitug also maintains that he was constructively discharged by defendants. As the Seventh Circuit has noted,

> An employer constructively discharges an employee only if it *makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.

*Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 536 (7th Cir.1993) (internal quotation marks and citations omitted) (emphasis in original). Furthermore, it is well established that the plaintiff must establish a nexus between the alleged discrimination and his "discharge." *See Rush v. McDonald's Corp.,* 966 F.2d 1104, 1112–13 (7th Cir.1992). In his complaint, Vitug details the facts surrounding the promotion denial, and states that defendants' "aforesaid intentional acts of discrimination, and subsequent and continuing refusal to correct discriminatory treatment have rendered the Plaintiff's working conditions intolerable, and Plaintiff was compelled to terminate his employment involuntarily on or about January 1, 1993." From the complaint, therefore, it appears that his constructive discharge claim is predicated solely upon

---

fairly." Even if this is so, it provides no support for Vitug's claim, since we hope and expect that every internal grievance procedure is handled in such a manner. In short, the pendency of Vitug's grievance did not toll the running of the relevant time limit, Vitug's blind optimism about the anticipated result notwithstanding.

**4.** We also note that Vitug's discrimination charge made no mention of religion-based discrimination. Vitug maintains that this claim is "like or reasonably related to" his race and ethnic origin claims, and should thus relate back to his initial IDHR filing. *See Babrocky v. Jewel Food Co.,* 773 F.2d 857, 864 (7th Cir.1985). We first observe that the religion claim is completely independent of the race and ethnic origin claims, and we are therefore unwilling to conclude that it was encompassed in those claims. Second, Vitug clearly was aware that Koenig and Jennings were members of the same religion and attended the same church; accordingly, there is no reason that he could not have included the "religion" allegation in his original filing. In any event, even if we resolved these issues in Vitug's favor, his religion-based claim would still fail, since we have concluded that the IDHR/EEOC filing

which he would have us attach the religion claim to is time barred.

Furthermore, although the administrative filing requirements are subject to equitable modification, Vitug has not demonstrated that such modification is warranted. Indeed, we note that he was represented by an attorney from June 20, 1991, the day he was denied the promotion, throughout all of the proceedings that followed. Absent some compelling basis for modifying the requirements of Title VII, we are unwilling to do so.

**5.** We also note that, to the extent that Vitug is attempting to make any religious-based discrimination or discharge claim under § 1981, that claim must fail. As defendants argued in support of their motion for summary judgment, section 1981 does not protect against religious discrimination. *See Anooya v. Hilton Hotels Corp.,* 733 F.2d 48, 50 (7th Cir.1984); *Poston v. Reliable Drug Stores, Inc.,* 783 F.Supp. 1166, 1167 (S.D.Ind.1992). In any event, Vitug did not respond to this argument in his response brief, and has therefore conceded the point. *Swedish Am. Hosp. v. Midwest Operating Eng'rs Fringe Benefit Funds,* 842 F.Supp. 1039, 1043 (N.D.Ill.1993).

the defendants' decision not to award him a promotion.

In support of his motion, however, he has identified a number of incidents between the promotion denial and his resignation which he claims further compelled him to leave. Specifically, Vitug claims: (1) Koenig and Jennings were "confrontational" and "overly aggressive;" (2) Jennings would give "threatening looks" when Vitug conversed with other auditor, and "tried to intimidate" other auditors into not seeking advice from Vitug; (3) other auditors eventually stopped interacting with Vitug; (4) Koenig gave Vitug the "silent treatment," or was arrogant and hostile; (5) Vitug was excluded from meetings of the auditors; (6) Jennings criticized Vitug's method of performing audits, and . stated his dissatisfaction with the amount of time they took and Vitug's lack of aggressiveness in obtaining information from taxpayers; and (7) Koenig and Jennings demanded that Vitug sign a performance goal, and argued with him when he refused to sign it.[6] It is important to note, however, what is not alleged. Vitug admits that, to the best of his knowledge, none of the defendants made any derogatory or insensitive comments regarding his race or ethnic origin. In addition, there is no allegation that any defendant ever made a derogatory remark about Vitug's religion. As a result, in order to prevail on his constructive discharge claims, at least under the legal theories he has presented, Vitug must demonstrate that the promotion process and/or decision was discriminatory, and further, that that discrimination is linked to his constructive discharge. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and

§ 1981 do not interfere. Unless [plaintiff]'s race mattered—unless he would have been kept on if he were white—he is not entitled to relief.") (citation omitted), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). We therefore turn to the merits of Vitug's promotion claim.[7]

Vitug provides two bases for his discrimination claim. First he alleges that the manner in which promotions are handled, *i.e.,* advertised by "word of mouth" and conducted through oral interviews, has a disparate impact upon minorities. In *Scales v. J.C. Bradford & Co.,* 925 F.2d 901 (6th Cir. 1991), the Sixth Circuit provided a useful overview of the requirements in disparate impact cases:

> Under a theory of disparate impact discrimination, a plaintiff may establish a *prima facie* case of discrimination by showing the existence of an employment practice which, although neutral on its face, has the effect of disproportionately affecting persons in a legally protected group. This theory is available to challenge promotion practices based upon subjective criteria. In order to prevail on a disparate impact discrimination claim, the plaintiff must establish a *prima facie* case by first identifying the specific employment practice that is challenged. Next, the plaintiff must show an adverse effect caused by the employment practice by offering "statistical evidence of a kind or degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group."

*Id.* at 907–08 (citations omitted). In the present case, Vitug has clearly identified the

---

6. Notwithstanding Vitug's rather broad characterizations of the conditions at MTC, defendants correctly note that in his deposition, Vitug was only able to identify a handful of specific events which he felt constituted "mistreatment" by defendants.

7. Although we concluded that Vitug's promotion claims are time barred, MTC's decision not to promote Vitug, if truly discriminatory, may still be used as evidence in support of his constructive discharge claim. *See United Air Lines, Inc. v.*

*Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered it is merely an unfortunate event in history which has no present legal consequences.").

specific employment practices he is challenging: "the personal oral interview and evaluation and word of mouth hiring." Where Vitug falters, however, is on the next step. In support of his claim, Vitug offers the affidavit of Neil Lane, who is an Assistant Statistician in cancer research at the University of Chicago. Lane reviews the "average minority presence" from an unspecified date to August 1990, and determines that it was "about 10%;" since that time, he notes that it has "improved" among auditors, but is still "low" among management-level employees. He offers no numbers relating to the actual number of minorities at MTC after August 1990.[8]

 The primary problem with Lane's affidavit is apparent. In a disparate impact case, general statistics related to the number of minority employees are insufficient; as noted above, the statistics must be "of a kind or degree sufficient to show that *practice in question* has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." *Scales*, 925 F.2d at 908 (quoting *Watson v. Fort Worth Bank & Trust Co.*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988)) (emphasis added). That is, Vitug must demonstrate that use of the *oral interview/word of mouth system* has a disparate impact on protected classes.[9] This he simply has not done. Furthermore, to the extent that Lane has provided actual figures, he has failed to compare them to the relative number of minorities in the auditor workforce. Absent this information, Lane's data is simply empty.[10] *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650–51, 109 S.Ct. 2115, 2121–22, 104 L.Ed.2d 733 (1989) (requiring

information about relevant labor market to support inference of discrimination).

 Vitug also offers the affidavit of psychologist Dr. Jane Halpert. To begin with, she expressly relies upon Mr. Lane's which, as discussed above, provides no assistance in the present analysis. We must therefore immediately question the value of any contribution Halpert might provide. Furthermore, like Lane, Halpert criticizes the value of the oral interview process from an academic standpoint, but similarly fails to provide meaningful data which would demonstrate that the practice engenders discriminatory results. Next, perhaps because Lane completely fails to address the religion aspect of Vitug's claim, Halpert suggests that "MTC has established a discriminatory pattern of hiring, and promoting applicants and employees who are White Born Again Christians." However, she offers no connection between this conclusion and the practice at issue, *i.e.*, the oral interview. Furthermore, she bases her "conclusion" on the fact that three of MTC's six Chicago employees are white born-again Christians, including Koenig, whom she characterizes as "instrumental in this pattern of hiring and promotion." Once again, however, there is a dearth of statistical data indicating how many of these individuals were hired or promoted using the oral interview method to which Vitug objects. Moreover, Halpert offers no data as to the presence or absence of born-again Christians in MTC as a whole, and she fails to acknowledge that the promotion decisions are made by three independent interviewers, each of whom ranked Vitug the lowest. Finally, Halpert concludes that the climate at MTC was

---

**8.** The remainder of Lane's affidavit concludes that the oral interview method, as applied, does not accurately measure an applicant's ability to perform. Of course, absent any discriminatory intent or impact, this fact alone, even if true, is irrelevant. *See Pollard*, 824 F.2d at 560.

**9.** Moreover, Lane's numbers, to the extent they are offered, report the percentage of "minorities," and is not specific to Filipinos, or even Asian/Pacific Islanders. This fact further limits the value of Lane's submission.

**10.** We further note that both Lane and Vitug suggest that George Fung was only promoted in

New York in response to Vitug's complaints of discrimination. However, Fung interviewed the same week that Vitug did, and received the second highest score of the four applicants. This happened before Vitug was informed that he had not received the promotion. When the top-scoring applicant in New York declined the position, it was offered to, and accepted by, the second-highest scoring applicant, George Fung. It is therefore apparent that Lane's suggestion of improper motive in promoting Fung has absolutely no basis in fact.

"intolerable," and that "MTC constructively discharged the Plaintiff." However, because this statement is a purely legal conclusion, and not supported in Halpert's affidavit, we shall disregard it. *See Specht v. Jensen*, 853 F.2d 805, 808–09 (10th Cir.1988). In short, Vitug has utterly failed to support his claim with any meaningful statistical evidence.[11] As a result, Vitug cannot establish a prima facie case, and his disparate impact claim must therefore fail.

■■■■ Vitug's disparate treatment claim must also fail. Under the familiar standard articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff must first make out a prima facie case of discrimination. This burden is "not onerous," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); here, Vitug must show that (1) he was qualified for the promotion he sought; (2) he was considered for the position and turned down; and (3) the promotion was given to someone else. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1113–14 (7th Cir.1992). The defendant must then articulate a legitimate, non-discriminatory reason for denying the promotion. *Id.* at 1114. As a result, even if we conclude that Vitug is able to establish a prima facie case, defendants have satisfied their burden: Vitug was not promoted because all three interviewers gave him the lowest score of the six applicants for the position. The ball then returns to Vitug's court. He retains the ultimate burden of persuasion, and must

demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with

the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination. [He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. It is at this stage that Vitug once again falters.

■■■■ In support of his claim, Vitug relies in large part upon the statistical analysis offered by Lane and Halpert discussed above. However, just as they are not relevant in the context of a disparate impact analysis, they are not relevant here. *See Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir.) (general statistics about minority representation in defendant's faculty "inadequate absent some further indication of their relevance" in disparate treatment case), *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). Vitug's other "evidence" is likewise uncompelling. He submits an affidavit from John Clancy, a former MTC employee. In his affidavit, Clancy makes various statements which, Vitug claims, demonstrates Koenig's discriminatory animus. First, Clancy states that, prior to joining MTC in 1988, he worked in the same building as Koenig. According to Clancy, Koenig once stated that he didn't want "certain" people form the California Franchise Tax Board applying for an opening in his office. As there were many minority employees there, Clancy "understood this to mean that Les Koenig did not want to hire minorities for the position." Clancy also recalls a con-

11. Defendants, on the other hand, offer the affidavit of Elisabeth Landes, a specialist in labor economics. She reviews the figures from the time MTC began using the challenged practice, March, 1988, to December, 1993, and concludes that the relative number of minority auditors hired exceeds the relative number of minority auditors in the workforce, the relevant comparison and time frame for our purposes. Furthermore, the documents submitted by MTC indicate that of the eighteen auditors hired since March, 1988, four, or 22.2%, are Asian/Pacific Islanders.

According to government documents, the total minority representation in the accountant and auditor workforce is only 16.7%. As a result, contrary to Vitug's assertion, the structured interview process seems to have a favorable impact upon minorities. With respect to the number of minorities in management level positions, the "structured interview" process has only been used to fill four positions, a sample size too small to offer any meaningful conclusion. We note, however, that one of those four was, in fact, George Fung, an Asian/Pacific Islander.

versation in which Koenig stated, "I want to work with people I get along with." He then states that *Jennings* had worked with a black supervisor with whom he did not get along. Clancy concludes that he "understood Les Koenig's desire to work with people he got along with as wanting to work only with whites." Vitug maintains that these statements are evidence of *Koenig's* discriminatory animus. This assertion is simply untenable. These statements contain no indication whatsoever of Koenig's view toward minorities, Clancy's broad "understandings" notwithstanding.[12]

In sum, Vitug has offered nothing more than broad and unsubstantiated conclusions in support of his claim of discrimination.[13] Absent meaningful statistical evidence or other indicia of discriminatory animus, Vitug can not state a claim under either Title VII or § 1981.[14] As a result, defendants are entitled to summary judgment.

### IV. Conclusion

For the reasons set forth above, defendants' motion for summary judgment is granted. It is so ordered.

---

**12.** The same is true of Clancy's comments regarding Koenig and Jennings' religious beliefs. According to Clancy, one of them (he doesn't specify whom) was "sometimes self-righteous and condescending" when discussing religion. This characterization is of minimal probative value in assessing whether Vitug was treated discriminatorily.

**13.** Although we granted summary judgment on Vitug's promotion claims because they are time-barred, it should be obvious from the above discussion that, even if we were to actually rule

on the merits of his promotion claims, Vitug would lose.

**14.** Given this conclusion, we need not determine whether the incidents and behavior which occurred during the period following the denial of the promotion created an environment "so intolerable that [Vitug was] forced into an involuntary resignation." *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987).